UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
RAHKEEM BROWN, *pro se*,	:
	:
               Petitioner,	:	**MEMORANDUM AND ORDER**
	:
               - against-	:	**07-CV-0058 (DLI)**
	:
R.K. WOODS, Superintendent,	:
Upstate Correctional Facility,	:
	:
             Respondent.	:
-------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

On January 10, 2007, Rahkeem Brown ("petitioner"), appearing *pro se*, filed this petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his April 24, 2000 jury conviction in New York Supreme Court, Queens County, for attempted murder in the second degree (N.Y. Penal Law §§ 110.00/125.25(1)), assault in the second degree (N.Y. Penal Law § 120.05(2)), criminal possession of a weapon in the second degree (N.Y. Penal Law § 265.02(4)), criminal possession of a weapon in the third degree (N.Y. Penal Law § 265.02(4)), and attempted robbery in the second degree (N.Y. Penal Law §§ 110.00/160.10(2)(a)).

Following petitioner's unsuccessful direct appeals to the Appellate Division, Second Department, and the New York State Court of Appeals, petitioner filed a motion to vacate the judgment of conviction based on newly discovered evidence pursuant to N.Y. Crim. Proc. Law § 440.10(1)(g). The Honorable Richard L. Buchter, Justice of New York Supreme Court, Queens County, denied petitioner's motion on October 5, 2005. The Appellate Division denied leave to appeal on January 4, 2006. *People v. Brown*, No. 2005-11113, 2006 WL 4635663 (2d Dep't Jan. 4, 2006).

Petitioner now contests the denial of the motion to vacate as grounded on an unreasonable determination of fact, resulting in his wrongful conviction based on perjured testimony. By Order dated February 16, 2007, this court found that petitioner failed to timely request habeas relief within the limitations period provided by the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2244(d)(1), and directed petitioner to show cause as to why the statute of limitations should not apply. Petitioner filed an Affirmation in response to the court's Order to Show Cause. By Order dated May 11, 2007, the court found that, based on a preliminary showing and limited record, petitioner set forth a colorable claim of actual innocence and ordered respondent to show cause as to why a writ of habeas corpus should not be issued. On July 5, 2007, respondent submitted its opposition, as well as the state court record. For the reasons set forth below, the petition is denied.

I. **BACKGROUND**

The following facts and procedural history related to this case are taken from the entire record, including transcripts from petitioner's trial and section 440.10 hearing, as well as affidavits from both parties, which respondent provided the court on July 5, 2007.

A. *The Shooting and Petitioner's Trial*

On January 9, 1999, at approximately 7:00 P.M., petitioner and co-defendant Eric Pope entered a cab driven by Fearon Lindsay. (Trial Tr. 294, 296, 366-67.) Prior to January 9, Lindsay knew Pope, but did not know petitioner. (*Id.* at 291, 305.) Pope sat in the front passenger seat, while petitioner sat in the rear seat on the passenger side. (*Id.*) Shortly thereafter, one of the passengers shot Lindsay in the face. (*Id.* at 297-98.) Lindsay testified that he watched petitioner enter the car and that petitioner shot him in the face as he turned to look at petitioner. (*Id.* at 297, 304.) Pope's trial testimony corroborated Lindsay's account of the

shooting. (*Id.* at 368.) The bullet entered Lindsay's right cheek, exited his left cheek, and ultimately shattered the driver-side window. (*Id.* at 311, 410.) Pope and petitioner immediately fled the scene. (*Id.* at 368.) Lindsay, still conscious, drove to a nearby gas station and asked someone to call for an ambulance. (*Id.* at 299.) Police responded to the call, the first officer on the scene being Police Officer Edward Sholl. (*Id.* at 237-38, 259-60.) Lindsay described his assailants to Officer Sholl as two black males, one of whom was named Eric. (*Id.* at 240-41, 267-68.) Shortly thereafter, an ambulance arrived and drove Lindsay to the hospital. (*Id.* at 329.) Lindsay explained to ambulance workers that he was shot in the face by a "friend" he had gone to pick up in his cab. (*Id.* at 329-30.) Doctors at Mary Immaculate Hospital treated Lindsay's injuries later that night. (*Id.* at 410.) Months later, Lindsay fully recovered. (*Id.* at 302-03.)

The second officer to arrive on the scene was Police Officer Michael Losco. (*Id.* 237-38.) After briefly conferring with Officer Sholl, Officer Losco patrolled the area in search of Lindsay's assailants. (*Id.* at 238.) Officer Losco soon noticed two men (Pope and petitioner) fitting the description provided by Lindsay and relayed to him by Officer Sholl. Both men emerged from the backyard of a house on the block where Lindsay had been shot. (*Id.* at 240-41.) Officer Losco stopped the two men and, after Pope admitted that his name was Eric, he arrested them. (*Id.* at 241-42.) Pope held the barrel of a handgun in his pocket and told Officer Losco that the other parts of the gun were held by Rhonda Graham, an acquaintance, whose house he and petitioner fled to after the shooting. (*Id.* at 242-43, 368, 371.) Next, Officer Losco proceeded to Graham's house and recovered the remaining parts of the gun. (*Id.* at 246, 263.) Neither the gun nor Lindsay's car were tested for fingerprints. (*Id.* at 281-82.) Further, police never checked for any indicia that either Pope or petitioner fired the weapon. (*Id.* at 282.)

3

The above facts are undisputed whereas others are not. For example, there is somewhat conflicting testimony regarding the events leading up to the time Pope and petitioner entered Lindsay's car and what occurred immediately after they entered the car. According to Lindsay, he received two pages from "a lady," presumably Graham, at Pope's request, so that Lindsay could drive Pope home. (*Id.* at 290, 292.) Lindsay responded and arrived at the requested pick-up location. (*Id.* at 292, 294.) Upon arrival, Lindsay learned that Pope's friend (petitioner) wanted a ride to McDonald's, and Lindsay agreed to take him. (*Id.* at 294, 296.) Lindsay also testified that shortly after entering the car, Pope demanded all of his money. (*Id.* at 297.) Lindsay responded, "Don't joke with me like that." (*Id.*) According to Lindsay, petitioner then stated, "We are not joking," which prompted Lindsay to turn towards petitioner. (*Id.*) At that point, Lindsay claimed, petitioner shot him in the face. (*Id.*)

In contrast, Pope testified that he paged Lindsay so that he could obtain marijuana. (*Id.* at 364, 383.) Once Lindsay arrived, Pope and petitioner entered the car, (*id.* at 367), and, according to Pope, Lindsay reached either beneath the driver-side seat or the driver-side dashboard to retrieve the marijuana. (*Id.* at 394.) Once Lindsay found the drugs, he turned towards Pope to hand them over, and petitioner shot Lindsay in the face. (*Id.* at 368.) Pope further testified that he and petitioner fled to Graham's house, where petitioner disassembled the gun and gave pieces of it to Pope and Graham. (*Id.* at 369-70, 398.) In a signed statement given to police shortly after the shooting, Pope provided the same account of the events. (*Id.* at 404-05.)

Pope further testified that he pled guilty to his involvement in the crimes at issue in this case, (*id.* at 371), and that as part of the plea bargain, the prosecution promised Pope a five-year prison term. (*Id.* at 378.) Pope also understood that he as part of the plea agreement, he would be expected to testify against petitioner. (*Id.* at 376.) In a subsequent guilty plea related to a

separate robbery Pope committed in Nassau County, New York, Pope was promised a separate five-year sentence, which was to run concurrently to the five-year sentence for his role in the Lindsay shooting. (*Id.* at 378-80.) Pope indicated that he received a concurrent sentence for his Nassau County guilty plea as a result of his cooperation with the prosecution in petitioner's case. (*Id.* at 379.)

On April 24, 2000, a jury convicted petitioner of attempted murder in the second degree, assault in the second degree, criminal possession of a weapon in the second degree, criminal possession of a weapon in the third degree, and attempted robbery in the second degree. On May 8, 2000, the court sentenced petitioner to concurrent sentences of twenty years of imprisonment for attempted murder in the second degree, seven years for assault in the second degree, ten years for criminal possession of a weapon in the second degree, and seven years imprisonment for criminal possession of a weapon in the third degree and attempted robbery in the second degree. On September 23, 2002, the Appellate Division, Second Department, affirmed petitioner's conviction, *People v. Brown*, 297 A.D.2d 748 (2d Dep't 2002), and the Court of Appeals denied petitioner's application for leave to appeal on December 4, 2002. *People v. Brown*, 99 N.Y.2d 556 (2002).

B. *Pope's Recantation and Petitioner's Motion to Vacate*

In March of 2002, petitioner claims to have met with Pope while both were incarcerated at the Clinton Correctional Facility in Dannemora, New York. (Pet'r Affirm. 2.)[1] During their meeting, Pope conveyed regret for testifying against petitioner during petitioner's trial, and expressed his desire to retract his testimony regarding petitioner's role in Lindsay's shooting.

---

[1] "Pet'r Affirm" refers to petitioner's Affirmation dated April 13, 2007, which was filed in response to this court's Order to Show Cause as to why this petition should not be dismissed as time-barred.

(*Id.*) Petitioner provided Pope with his appellate counsel's contact information and directed Pope to contact her if he was indeed sincere. (*Id.*) Pope's exchange with petitioner's appellate counsel culminated in the execution of an affidavit, dated February 12, 2003, in which Pope recanted his trial testimony and admitted that he, and not petitioner, shot Lindsay. (Pet. Ex. A.) Pope's affidavit provides in relevant part:

> Although I testified at Rahkeem Brown's trial that he shot Fearon Lindsay . . . that was not true. In fact, I shot Lindsay, and Mr. Brown was not aware that I had any intention of doing this.
>
> . . . [As I waited for Lindsay to pick me up in his cab,] Rahkeem Brown, who I knew as Bison, was coming down 146th Street . . . . After exchanging greetings, Bison said he had to go home. I told him to wait, because I had a ride coming.
>
> When Lindsay drove up, I got into his car, and asked if he would give Brown a ride. He agreed. I got into the front passenger seat, and Brown got into the rear passenger seat. I said to Lindsay, "Give me what you got", [*sic*] knowing he would assume I wanted marijuana. He reached under the left hand side of the driver's seat, which is where he stores marijuana. He was facing towards the left, and had the back of his head toward me. At that point, I shot him. I believe his head hit the window. I shot Lindsay because I was angry at him because he had propositioned me [sexually] several times previously . . . . Brown helped me disassemble the gun . . . .

(*Id.* at 1-2.)

Pope submitted to a polygraph examination to support the truthfulness of the statements made in his affidavit, but the results of that test have been interpreted in divergent ways by the opposing parties. (*Compare* Pet. Ex. D (finding that Pope was truthful in his responses during the exam) *and* Bricker Aff. ¶ 11 (noting that the District Attorney's polygraph examiner found Pope's responses to "reveal deception.")) Respondent also notes in its opposition that on December 8, 2003, two detectives from the District Attorney's Office interviewed Pope with regard to his affidavit. (Bricker Aff. ¶ 11.) During that meeting, Pope told detectives that

6

petitioner's counsel informed him that while he could be charged with perjury for recanting prior testimony, the District Attorney's Office rarely pursued such charges. (*Id.*)

On February 8, 2005, petitioner moved the New York Supreme Court, Queens County, to vacate judgment against him pursuant to N.Y. Crim. Proc. Law § 440.10(1)(g). In that motion, petitioner presented Pope's affidavit as "newly discovered evidence which could not have reasonably been introduced at trial." (Levinson Aff., Feb. 8, 2005, ¶ 2.) Petitioner also claimed that Pope's testimony "clearly would have influenced [the] jury." (Levinson Aff., Feb. 8, 2005, ¶ 24.). The court held an evidentiary hearing on September 21, 2005. During the hearing, Pope testified that he shot Lindsay and that his previous testimony claiming that petitioner shot Lindsay was fabricated. (Hr'g Tr. 6-7.) Pope also testified that he asked petitioner to come with him in Lindsay's car, but was not clear as to why he did so. (*Id.* at 5.) Pope initially stated that he wanted petitioner present for assistance in the event that Lindsay resisted the attack, (*id.* at 7-8.), but later claimed that he invited petitioner so that petitioner could "see [the] crime." (*Id.* at 14.) When asked why he voluntarily created a witness that could testify against him, Pope stated that "[w]ith that, you would have seen it as my word against [petitioner's word]." (*Id.*)

Aside from the inconsistencies revealed during the hearing testimony itself, additional contradictions exist between Pope's hearing testimony and Pope's affidavit. In Pope's affidavit, he claimed that petitioner entered Lindsay's car because petitioner wanted a ride home, (Pet. Ex. A ¶ 2), but during the hearing, Pope testified that petitioner wanted a ride to go get something to eat. (Hr'g Tr. 5.) Moreover, in Pope's affidavit, he claimed that Rhonda Graham and her brother Douglas each paged Lindsay. (Pet. Ex. A ¶ 3.)[2] In contrast, Pope testified during the hearing that he paged Lindsay himself. (Hr'g Tr. 17.) Under further questioning, Pope again

---

[2] Pope's affidavit contains two consecutive paragraphs numbered as paragraph three. This citation refers to the first of those paragraphs.

7

changed his story, claiming that the Graham siblings each unsuccessfully paged Lindsay one time, and that it was a third page that Pope himself made, which finally prompted Lindsay to pick him up. (*Id.* at 20.) This testimony further contradicts the testimony Pope provided during petitioner's trial. (Trial Tr. at 291-92, 364-65.) Finally, while Pope claimed in his affidavit that petitioner helped him disassemble the gun, (Pet. Ex. A ¶ 6), during the hearing, Pope testified that he fabricated this statement in his affidavit and that it was he alone who disassembled the gun. (Hr'g Tr. 26.)

In a written decision and order, the court found Pope's recantation to be "untrustworthy, illogical and unreliable," based chiefly on three grounds: (1) the inconsistency between the affidavit and hearing testimony regarding the dismantling of the gun; (2) its finding that Pope's story was "illogical and incredible" and "made no sense"; and (3) Pope could not credibly explain petitioner's presence in the vehicle during the crime. (Decision and Order on Motion to Vacate Judgment, Oct. 6, 2005, Buchter, J.) The court also noted the dubious nature of Pope's recantation insofar as it came three years after Pope testified at petitioner's trial, and only after Pope and petitioner were housed in the same correctional facility. (*Id.* at 2.) Further, the court found Pope's testimony -- that he and petitioner engaged in a friendly relationship after Pope falsely testified against him -- strained credibility. (*Id.*) Accordingly, the court dismissed petitioner's motion to vacate judgment, and petitioner sought leave to appeal to the Appellate Division, Second Department.

In petitioner's application for leave to appeal to the Appellate Division, petitioner claimed that the hearing court's determination that Pope's recantation testimony was not credible was an unreasonable determination and was against the weight of the evidence. (Levinson Aff., Nov. 23, 2005, ¶ 11.) The Appellate Division summarily denied petitioner's leave to appeal on

January 4, 2006. (Decision and Order on Application, Jan. 4, 2006, Mastro, J.) Petitioner did not seek leave to appeal to the New York Court of Appeals, as "[o]rders denying a motion to vacate judgment are not appealable to the Court of Appeals." *Jones v. Dep't of Corr.*, 216 F.R.D. 237, 239 (E.D.N.Y. 2003); *see also* N.Y. Crim. Proc. Law § 450.90(1).

C. *The Habeas Petition*

On December 29, 2006, petitioner filed this writ of habeas corpus and set forth a number of issues for the court's consideration. The issues enumerated in the petition are as follows:

> (1) Whether the court's determination that witness's recantation of prior testimony was not credible was insufficient to establish that witness's trial testimony was not perjured; (2) whether the eyewitness did in fact commit perjury at petitioner's trial; (3) whether Petitioner's due process rights were violated by admission of perjured testimony; (4) whether the court must weigh all the evidence of perjury before it, including but not limited to the recantation, before reaching such conclusion; (5) whether the state court resolved a question of fact concerning the probable impact of newly discovered evidence on a jury; (6) would Petitioner have been convicted, despite the perjured testimony?

(Pet. 1 (minor grammatical edits made).)

Petitioner's essential claim may be summarized in a single sentence: the trial court's determination that Pope's recantation testimony was not credible was unreasonable in light of the available evidence. If Pope's recantation was found to be credible, as petitioner argues it should have been, the jury convicted petitioner largely on the basis of perjured testimony, thereby violating petitioner's due-process rights. Petitioner also requests that the court consider the effect that Pope's recantation testimony would have had on the grand jury that indicted him. (Pet. 7.) Petitioner claims that Pope's allegedly perjured testimony was the only testimony offered to the grand jury, and that they would not have indicted petitioner if the prosecution presented Pope's recantation testimony. (*Id.*)

9

By Order dated February 16, 2007, this court found petitioner's request for habeas relief to be time-barred and directed petitioner to show cause as to why the statute of limitations should not apply. Petitioner filed an Affirmation in response to the court's Order to Show Cause. By Order dated May 11, 2007, the court found that, based on a preliminary showing and limited record, petitioner set forth a colorable claim of actual innocence and Ordered the Queens County District Attorney's office to show cause why a writ of habeas corpus should not be issued.

## II. DISCUSSION

Petitioner asserts that the statute of limitations should be tolled in light of his claim of actual innocence. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier*, 477 U.S. 478, 496 (1986); *see also Schlup v. Delo*, 513 U.S. 298, 321 (1995) (The Supreme Court has "consistently reaffirmed the existence and importance of the exception for fundamental miscarriages of justice."). In such cases, the principles of comity and finality yield to the necessity of correcting the fundamental miscarriage of justice. *Carrier*, 477 U.S. at 495. Where the requirements for the exception are met, the claim of innocence does not itself qualify as the constitutional claim, but is "instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

Although the Second Circuit has acknowledged that the question as to whether the United States Constitution requires that an "actual innocence" exception be engrafted onto the AEDPA's statute of limitations "remains open," the court has nonetheless directed district courts to consider a claim of actual innocence before dismissing a habeas petition as untimely filed. *Doe*

*v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004), *cert. denied*, 546 U.S. 961 (2005). A petitioner claiming actual innocence "must support his claim 'with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.'" *Id.* (quoting *Schlup*, 513 U.S. at 324). Review of a claim of actual innocence requires a two-step analysis. First, the habeas court must first determine whether the evidence presented by petitioner is reliable "by considering it both on its own merits, and where appropriate, in light of the pre-existing evidence in the record." *Id.* at 161. Second, upon a finding of reliability, the habeas court must consider whether, in light of all the evidence presented both at trial and subsequently, including evidence that may have been inadmissible at trial, it is more likely than not that "no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 162 (citing *Schlup*, 513 U.S. at 327).

Here, petitioner presents new evidence in the form of the recantation of an eyewitness account of his co-defendant, Pope. Petitioner asserts that when housed at the same correctional facility as Pope, Pope expressed his desire to retract his testimony regarding petitioner's role in Lindsay's shooting. (Pet'r Affirm. 2.) As a result of this conversation, Pope executed an affidavit and submitted to a polygraph test for the purpose of recanting his trial testimony and identifying himself as the person who shot Lindsay. Pope further declared that petitioner was merely an unknowing bystander, but that petitioner subsequently helped Pope disassemble the gun.

Courts have routinely recognized that witness recantations "must be looked upon with the utmost suspicion." *Haouari v. United States*, 510 F.3d 350, 353 (2d Cir. 2007) (quoting *Ortega v. Duncan,* 333 F.3d 102, 107 (2d Cir.2003)). "[S]uspicions are even greater when, as here, the recanting witness is one who was involved in the same criminal scheme and, having received the

benefit of his cooperation agreement, now sits in jail with nothing to lose by recanting." *Id*. (citing *Newman v. United States*, 238 F.2d 861, 862 (5th Cir.1956)).

Petitioner claims that Pope's recantation testimony is trustworthy, as it is supported by other evidence in the record. First, petitioner attempts to bolster the credibility of Pope's recantation testimony by focusing on the victim's allegedly unreliable testimony. Petitioner claims that Lindsay's testimony— that petitioner shot him while he faced petitioner directly— is inconsistent with Lindsay's injuries and the fact that the bullet shattered the driver-side window. Had petitioner fired the gun, petitioner asserts, the bullet would not have entered through Lindsay's right cheek and exited through his left. Petitioner further argues that had he fired the gun, the bullet would have shattered the front windshield, rather than driver-side window. (Pet'r Affirm. 8.) Petitioner also notes that Lindsay testified that he told EMS and hospital workers that he was shot by his "friend," and that Lindsay knew Pope and not petitioner before the shooting. (*Id.* at 8-9.)

Next, petitioner claims that Pope's recantation is trustworthy because Officer Sholl's trial testimony was impeached by earlier testimony the officer offered during petitioner's *Wade* hearing. (*Id.* at 9.) At trial, Officer Sholl testified that Lindsay identified petitioner as his assailant when he was at the hospital. (*Id.*) In contrast, Officer Sholl testified at the *Wade* hearing that Lindsay stated at the hospital that he did not know who shot him. (*Id.*) Petitioner next argues that Lindsay was shown "an unduly suggestive photo array" from which to identify his assailant. (*Id.*) The photo array consisted of two photos, one of petitioner and one of Pope. (*Id.*) Finally, petitioner claims that the police officers did not check the gun or car for fingerprints, nor did they evaluate petitioner or Pope for evidence establishing who fired the gun; Petitioner asserts that Pope's recantation established that Pope had a motive to assault Lindsay—

12

retribution for the sexual advances made in the past by Lindsay — and that the recantation explained why Lindsay testified that he never saw petitioner with the gun — because it was concealed in Pope's sleeve. (*Id.* at 10.)

Alternatively, respondent argues that petitioner relies on weak, non-scientific evidence, which the hearing court rejected, and which does not meet the standard of reliability for new evidence demanded by *Schlup*. (Resp't Br. 11.) As the hearing court found, and respondent claims, Pope's affidavit and recantation testimony is facially incredible and riddled with inconsistencies. (*Id.* at 12-14.) For example, Pope claimed in his affidavit that both he and petitioner disassembled the gun after the shooting, but during the hearing Pope admitted to lying in his affidavit and that it was he alone who disassembled the gun. (*Id.* at 14-15.) Further, respondent claims, and the hearing court found, that Pope could not credibly explain petitioner's presence in the car. (*Id.* at 15.) Inviting petitioner to join Pope in Lindsay's car served only to create a witness to Pope's crime, which simply makes no sense. (*Id.* at 15-17.) In addition to the weakness of Pope's recantation, respondent also notes that petitioner fled the crime scene and argues that this implies that petitioner was the shooter. (*Id.* at 17-18.)

Turning to Pope's recantation testimony, the court finds it unreliable for a plethora of reasons: (1) Pope not only contradicted himself when explaining why he invited petitioner to join him in Lindsay's car, but the reason Pope requested petitioner's presence in the car evolved during his hearing testimony; (2) Pope could not provide a logical explanation as to why he made petitioner a witness; (3) Pope admitted during the recantation hearing that he lied in his supporting affidavit regarding who disassembled the gun; (4) Pope could not consistently explain who paged Lindsay; and (5) even if Pope's recantation affidavit and testimony were accepted, Pope's explanation of how he shot Lindsay (Lindsay's "whole back was turned" was facing

Pope) is inconsistent with Lindsay's actual injuries. Petitioner's argument that the new evidence presented is reliable because it comports with other evidence presented at trial fails because while the court is to make its determination in light of all the evidence available, it does not follow that the newly presented evidence need not have some level of independent credibility. Viewed independently of all other evidence, Pope's recantation is far from trustworthy. As noted, Pope lied in his affidavit and equivocated throughout petitioner's section 440.10 hearing. Furthermore, the court is disturbed by the timing of Pope's change of heart, which occurred approximately two years after Pope testified against petitioner at trial and shortly after Pope and petitioner were housed at the same correctional facility.

Viewed in light of the pre-existing evidence, the court finds Pope's recantation testimony no more reliable. During petitioner's trial, Lindsay testified that he watched petitioner as he entered the back seat of his car. Lindsay also testified that shortly after entering the car, Pope demanded all of Lindsay's money. (Trial Tr. at 297.) According to Lindsay, when he responded, "Don't joke with me like that," petitioner stated, "We are not joking." (*Id.*) Petitioner's remark prompted Lindsay to turn towards petitioner, at which point, petitioner shot him in the face. (*Id.*) Petitioner takes issue with the known trajectory of the bullet, asserting that if the events occurred as Lindsay stated that they did, the bullet would not have entered Lindsay's right cheek, exited his left cheek and shattered the driver-side window. Instead, petitioner asserts, Lindsay's testimony is only consistent with Pope's new version of the events. (Pet'r Affirm. 7.) The court fails to understand how Lindsay's injuries are inconsistent with Lindsay's claim that petitioner shot him in the face while seated in the rear-passenger seat of Lindsay's car. Moreover, there is no dispute that petitioner was a passenger in the car during the shooting, and it is further undisputed that shortly after the shooting, Officer Losco found

petitioner with Pope as they emerged from the backyard of a house on the block where Lindsay was shot. Had petitioner been unaware of Pope's alleged plan to shoot Lindsay, as Pope claimed during his recantation testimony and in his affidavit, the court finds no logical explanation why petitioner would remain with Pope after he had attempted to murder Lindsay.

The court recognizes the divergent reasons for Pope's and petitioner's presence in Lindsay's car. While Lindsay claims that he was merely paged to provide Pope with a ride, Pope claims that he paged Lindsay for the purpose of obtaining marijuana. Regardless of which story is closer to the truth, Lindsay consistently testified that both Pope and petitioner were responsible for the shooting and Lindsay identified petitioner as the shooter unequivocally throughout his testimony. (Trial Tr. at 297, 304, 308, 321, 342.) Officer Sholl also testified that when visiting Lindsay in the hospital, Lindsay identified petitioner as the person who shot him in the face. (*Id*. at 274, 277.) Conversely, Pope's testimony, particularly when coupled with his recantation testimony, proved inconsistent.

In sum, the court agrees with Justice Buchter's characterization of Pope's recantation testimony as "untrustworthy, illogical and unreliable." In light of the foregoing, the court finds that petitioner fails to satisfy the *Schlup* standard for making an actual innocence claim, as the newly presented evidence does not meet the requisite level of reliability. Accordingly, the court need not determine what a reasonable juror would find in light of this new evidence. Thus, petitioner's request for a writ of habeas corpus is time-barred.

### III. CONCLUSION

Petitioner's request for a writ of habeas corpus is denied as time-barred and because petitioner failed to establish that the statute of limitations should be tolled due to a claim of actual innocence. A certificate of appealability shall not issue as petitioner has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253 (c)(2); Fed. R. App. P. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Luciadore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000). The court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for purpose of an appeal. *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

DATED:   Brooklyn, New York
         March 20, 2008

                                             _____/s/_____
                                              DORA L. IRIZARRY
                                             United States District Judge